

**FILED**

JUL 2 7 2010

PATRICK E. DUFFY, CLERK

By_____
DEPUTY CLERK, MISSOULA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, Plaintiff, | ) ) ) ) | CV-08-43-M-DWM |
| vs. | ) ) | ORDER |
| UNITED STATES FOREST SERVICE, UNITED STATES FISH & WILDLIFE SERVICE, and NATIONAL MARINE FISHERIES SERVICE, Defendants. | ) ) ) ) ) ) ) | |

## I. Introduction

The Plaintiff in this case, Forest Service Employees for Environmental

Ethics, seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, of federal agency actions and the associated planning documents

relating to the use of chemical fire retardant to fight wildfires on United States

Forest Service lands.  Plaintiff's Second Amended Complaint alleges claims under

the National Environmental Policy Act ("NEPA") (Count I) and the Endangered

Species Act ("ESA") (Counts II-IV).  The planning documents challenged are the

Forest Service's Environmental Assessment, Decision Notice, and Finding of No

Significant Impact; and the Biological Opinions issued by the Fish and Wildlife

Service and NOAA's National Marine Fisheries Service ("NOAA Fisheries").[1]

Plaintiff asks the Court to declare that the agencies have violated the

relevant statutes and to set aside the challenged documents.  Plaintiff seeks

injunctive relief compelling the agencies to comply with the law, and also requests

an award of reasonable fees, costs, and expenses, including attorney's fees.  The

case is now resolved on the parties' cross-motions for summary judgment for the

reasons set forth below.

## II. Background

### A.   The 2003 Case

This legal dispute originated in a 2003 case in which Plaintiff sued the

Forest Service, claiming that the agency should conduct a NEPA analysis and

consult with the Fish and Wildlife Service pursuant to ESA § 7 regarding its use of

chemical fire retardant.  Forest Service Employees for Environmental Ethics v.

---

[1]The Fish and Wildlife Service and NOAA Fisheries are herein referred to collectively as
the "ESA agencies."

United States Forest Service, 397 F. Supp. 2d 1241 (D. Mont. 2005) (the "2003 case"). Summary judgment was granted in favor of the Plaintiff on both the NEPA and ESA claims. In its discussion of the agency's failure to comply with NEPA, this Court concluded that "[i]t is probable that substantial questions are raised here as to the environmental impact of the annual dumping of millions of gallons of chemical fire retardant on national forests." 397 F. Supp. 2d at 1254. The Court ordered the Forest Service to comply with NEPA, leaving it to the agency to determine whether an environmental impact statement is necessary or an environmental assessment will suffice. In the ESA context, the Court rejected the Forest Service's argument that post-hoc, case-by-case consultation through the regulatory emergency consultation procedure is sufficient to satisfy the requirements of the ESA. The Court ordered the Forest Service to begin formal consultation with the Fish and Wildlife Service. Id. at 1257. The Court did not enjoin the continued use of chemical fire retardant.

The Forest Service did not diligently pursue compliance with the judgment. Unable to meet the Court's original deadline for NEPA compliance of August 8, 2007, the Forest Service sought and received an extension until October 10, 2007. Forest Service Employees for Environmental Ethics v. United States Forest Service, 530 F. Supp. 2d 1126, 1127 (D. Mont. 2008). On October 10, 2007, the

-3-

Forest Service issued an Environmental Assessment (USFS AR 337).[2] Id. at 1128.

Plaintiff filed a motion for contempt on the same day, arguing the Forest Service

had failed to meet the Court's deadline because it had not fully complied with

NEPA. Id. The agency attempted to moot the contempt motion by hastily filing a

Decision Notice and Finding of No Significant Impact on October 11, 2007 (USFS

AR 326). Id. The Forest Service then sought to justify its untimely compliance by

placing the blame on the ESA agencies, claiming it could not complete its analysis

and issue a decision notice until formal ESA consultation was complete. Id. at

1129-1130.

The Court was not persuaded by the Forest Service's argument, in large part

because the record showed that the ESA agencies had not completed consultation

due to the Forest Service's incomplete, insincere, and untimely efforts to comply

with the law and the Court's orders. 530 F. Supp. 2d at 1131-1134.[3] The Court

---

[2]Citations to the Forest Service Administrative Record are in the following format: USFS AR [document number] at [Bates number].

[3]See 530 F. Supp. 2d at 1127 ("The Forest Service has, throughout these proceedings, evidenced a strategy of circumventing, rather than complying with, NEPA and ESA."); 1131 ("The record in this case shows the Forest Service had no real intention to comply with the law or the Court's Orders."); 1132-1133 ("The record reveals a pattern of conduct showing the Forest Service either deliberately disregarded the obligations attendant to its role in the consultation process, or performed these obligations only perfunctorily."); 1134 ("A straight reading of the record here indicates that the Forest Service had no intention to comply with the Court's orders, or, at the very least–considering its lackluster participation in the consultation process–simply did not care enough about its regulatory and legal obligations to engage the process in a manner that meaningfully contributed to it.")

also expressed doubt about the sufficiency of the Forest Service's Environmental Assessment, noting that but for the contrary insistence of the ESA agencies, the Forest Service would have conducted an assessment of only the narrow question of its continued use of the 2000 Guidelines,[4] rather than the proper Court-ordered analysis of the use of retardant generally. Id. at 1134-1135.

A contempt hearing was set for February 26, 2008. Eight days before the hearing, on February 18, 2008, the Forest Service issued an amended Decision Notice and Finding of No Significant Impact accepting the reasonable and prudent alternatives established by the ESA agencies. USFS AR 341. The Court held the contempt hearing as scheduled and issued an order afterward in which it denied the motion for contempt on the ground that the contempt power may be used only to coerce compliance with the law and court orders, and may not be used for punitive reasons. Doc. No. 157, CV 03-165-M-DWM. Finding that the Forest Service had complied with the judgment by performing a NEPA analysis and consulting with the ESA agencies, the Court dismissed the 2003 case on March 12, 2008. Doc. No. 160, CV 03-165-M-DWM. Three weeks later, on April 2, 2008, Plaintiffs filed this action challenging the NEPA and ESA documents that resulted from the Forest Service's compliance.

---

[4]Guidelines for Aerial Delivery of Retardant or Foam near Waterways, USFS AR 131.

**B.     The Forest Service's Use of Chemical Fire Retardant**

The Forest Service has used chemical retardants to fight wildfires on federal

lands since at least 1955.  USFS AR 337 at 9.  Today, fire retardant solutions are

85 percent water, with the remainder consisting mostly of inorganic fertilizer

along with thickeners and corrosion inhibitors.[5]  Id. at 10.  Retardant is used

primarily in the western part of the country; it is not commonly used in the

Northeast or Midwest, and is used periodically in the Southeast.  Id. at 8.

**C.     The Forest Service's ESA Consultation**

The Forest Service consulted under the ESA with both the Fish and Wildlife

Service and NOAA Fisheries.  USFS AR 339 at 1; USFS AR 1075 at 1.  The ESA

agencies issued programmatic biological opinions, defining the action area as all

National Forest System lands (totaling 192 million acres) together with a buffer

area surrounding those lands.  USFS AR 339 at 10-11; USFS AR 1075 at 17.

According to the Fish and Wildlife Service, "[t]he size of this buffer is dependant

upon the species in question and the likelihood of said species being exposed to

fire retardant when applied on [National Forest System] lands."  USFS AR 339 at

11.  NOAA Fisheries defined the action area "broadly to encompass lands and

---

[5]Sodium ferrocyanide has been used as a corrosion inhibitor in the past, but has been
linked to fish kills resulting from accidental spills and is no longer an ingredient in retardant used
by the Forest Service.  USFS AR 337 at 10.

waters of the United States with particular emphasis on [Forest Service] lands and adjacent properties." USFS AR 1075 at 17. The ESA agencies assumed that any listed species within the action area could potentially be affected by the use of fire retardant, resulting in a significant number of listed species included in the analyses: 27 species for NOAA Fisheries and 387 species for the Fish and Wildlife Service. USFS AR 1075 at 18-19; USFS AR 339 at 11-20.

### 1.     The NOAA Fisheries Biological Opinion

NOAA Fisheries issued its first Biological Opinion on October 9, 2007. USFS AR 338. The agency issued an amended Biological Opinion in June of 2008 to correct typographical errors in the original. USFS AR 827. The agency amended its opinion again to include an analysis for the recently-listed Oregon Coast coho salmon, and issued the currently operative Biological Opinion on July 25, 2008. USFS AR at 1075. The Biological Opinion concludes that the Forest Service's use of fire retardant is likely to jeopardize the continued existence of all 27 listed species examined by NOAA Fisheries, and likely to destroy or adversely modify critical habitat for 23 of those species. Id. at 140.

NOAA Fisheries went on to identify a reasonable and prudent alternative that "must be implemented in its entirety" to avoid jeopardy to the 27 listed species and prevent destruction or adverse modification of their habitat. USFS AR

1075 at 141. The reasonable and prudent alternative contains the following

provisions:

1.  The Forest Service must evaluate the toxicity of two retardant formulations that have not yet been studied, and must similarly evaluate any new formulations, and report the results to NOAA Fisheries within two years.

2.  The Forest Service must perform toxicological studies on all currently approved long-term fire retardants to evaluate acute and sub-lethal impacts on fish. The Forest Service must work with NOAA Fisheries to develop a research plan within one year.

3.  The Forest Service must develop guidance for on-site assessment of waterways in which retardant is dropped.

4.  The Forest Service must implement a policy requiring personnel to report to NOAA Fisheries on all drops in waterways, including information on the amount of retardant dropped, the area affected, whether the drop was accidental or intentional, the expected direct and indirect impacts, and the results of field evaluation of the affected waterway.

5.  The Forest Service must provide NOAA Fisheries with a biannual summary of the cumulative impacts of the Forest Service's continued use of fire retardant.

USFS AR 1075 at 141-143.

There is no incidental take statement in the NOAA Fisheries Biological

Opinion. The agency explained that uncertainty over where and to what extent

retardant will be used made it impossible to supply an incidental take statement:

-8-

The [Forest Service] applies long-term fire retardants in response to emergency circumstances. The goal of this program-level Opinion is to evaluate the impacts to [NOAA Fisheries'] listed resources from the [Forest Service's] broad use of aerially applied fire retardants. Since specific emergency actions and the scope of [the Forest Service's] response to those emergencies cannot be predicted, it is not possible to identify specific take that could occur. Instead, this Opinion anticipates the general effects that would occur from the [Forest Service's] use of aerially applied long-term fire retardants across the landscape. This Opinion does not exempt incidental take of listed fish or wildlife species from the prohibitions of section 9 of the ESA for the [Forest Service's] use of aerially applied long-term fire retardants.

USFS AR 1075 at 143-144.[6]

NOAA Fisheries goes on to explain that it will authorize take on a case-by-case basis each time the use of fire retardant has the potential to affect listed species. The agency intends for the emergency consultation regulation[7] to be invoked in each such instance. The Biological Opinion states:

In the event incidental take is anticipated during the emergency response, [NOAA Fisheries'] Regional Office can advise the [Forest Service] of ways to minimize the take. Generally, however, an incidental take statement in an emergency consultation does not include reasonable and prudent measures or terms and conditions to minimize take, except where an agency has an ongoing action related to the emergency. The incidental take statement, however, would document the recommendations given to the [Forest Service] to minimize take during information [sic] consultation, the success of

---

[6]"Long-term" fire retardants are those that continue to retard burning even after their water component has evaporated. USFS AR 339 at 3.

[7]50 C.F.R. § 402.05.

the agency in carrying out these recommendations and the effects of the emergency on the listed resources, and determine whether the emergency action "is not likely to jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation, or is not likely to destroy or adversely modify the critical habitat of such species. [sic]

USFS AR 1075 at 144.

NOAA Fisheries also made a non-binding "conservation recommendation" encouraging the Forest Service to employ flight navigation and guidance technology to avoid misapplication of retardants in waterways. USFS AR 1075 at 144.

## 2.    The Fish and Wildlife Service Biological Opinion

The Fish and Wildlife Service issued its Biological Opinion on February 15, 2008. Like NOAA Fisheries, the Fish and Wildlife Service prepared a programmatic Biological Opinion; the analysis covers 387 listed species, and the agency concluded that the proposed action will result in jeopardy and/or destruction or adverse modification of critical habitat for 45 listed species. USFS AR 339 at 1, 11-20. The consultation was coordinated from the agency's Washington, D.C. headquarters, with specialists from each regional office contributing to the analysis for the species on which they have the most expertise.

The Fish and Wildlife Service began its analysis by applying what it calls a

"coarse filter" to all 387 listed species.  The coarse filter was intended to allow the

agency to make a preliminary jeopardy determination for each species.  USFS AR

339 at 21.  The coarse filter analysis began by breaking the listed species into the

following taxonomic groups: plants, invertebrates, fishes, amphibians, reptiles,

birds and mammals.  Id.  The agencies then used existing literature to identify

subgroups based on heightened vulnerability to exposure to fire retardant.  The

following subgroups were selected for closer analysis: legumes, aquatic

invertebrates, freshwater mussels, terrestrial invertebrates, and ruminants.  Id.

The Forest Service then considered the potential effects of fire retardant on

the groups and subgroups by applying a four-step analysis.  First, the agency

considered the range and distribution of the species.  USFS AR 339 at 21.  Well-

distributed species with many populations were deemed at low risk of jeopardy.

Id.  The agency next considered the likelihood that a species would be exposed to

fire retardant during a fire.  Id.  The third step asks whether exposure of a species

to retardant is likely to result in take.  Id. at 22.  Finally, for those species for

which the Fish and Wildlife Service concluded that take may occur, the agency

went on to ask whether the amount of take would be likely to jeopardize the

continued existence of the species.  Id.  This "coarse filter" analysis yielded a

preliminary determination that 181 species were not likely to be jeopardized by the

Forest Service's continued use of fire retardant. Id. at 11.

The Fish and Wildlife Service sought more detailed analysis of the 206 remaining species from its regional and field offices. USFS AR 339 at 22. The agency also distributed the list of 181 species for which the coarse filter yielded a "no jeopardy" determination, so that its regional and field offices could "ground truth" the coarse filter and conduct more analysis where needed. Id. at 22-23. The process resulted in additional analysis for 11 of the 181 species given a preliminary "no jeopardy" finding, together with detailed analysis for all 206 species for which the coarse filter found some potential for jeopardy. Id. at 23. The end result was a determination by the Fish and Wildlife Service that the aerial application of fire retardant on federal lands is likely to result in jeopardy or destruction/adverse modification of critical habitat for 45 species, while 342 species are not likely to be jeopardized or to suffer destruction or adverse modification of critical habitat. Id. at 23-29, 39-41.

The Fish and Wildlife Service then set forth a reasonable and prudent alternative that, when "added to the action as proposed,"[8] is expected to avoid jeopardy and adverse modification to any species. USFS AR 339 at 118-120. The

---

[8]At the time the Fish and Wildlife Service issued its Biological Opinion, the Forest Service had already incorporated into the proposed action the reasonable and prudent alternative imposed by the NOAA Fisheries Biological Opinion. USFS AR 339 at 9-10.

reasonable and prudent alternative requires the Forest Service to develop species-specific measures to be implemented during fire response emergencies. Id. at 119. The measures must include preparation of current maps of the distribution of listed species, prioritization of fuel reduction near critical habitat, guidance encouraging the use of less toxic retardants, and emergency consultation procedures during a wildfire response. Despite the imposition of this reasonable and prudent alternative, the Fish and Wildlife Service makes clear that its Biological Opinion "in no way limits the actions that an incident commander deems necessary to undertake during a fire emergency response." USFS AR 339 at 120.

The Fish and Wildlife Service did not include an incidental take statement in its Biological Opinion. USFS AR 339 at 120. Instead, the agency expects take to be authorized through emergency consultation on a case-by-case basis:

> As the [Forest Service] implements their action in each National Forest, the [Forest Service] must work with local Fish and Wildlife Service offices to conduct local level stepped-down consultations to determine the amount or extent of incidental take and to obtain incidental take statements from the Fish and Wildlife Service.... Therefore, at minimum, if fire retardant is used in the vicinity of listed species or critical habitat, the [Forest Service] must conduct consultation under the emergency procedures as stated in the regulations at [50 C.F.R. § 402.05].

Id.

**D.    The Forest Service's NEPA Compliance**

The Forest Service prepared an Environmental Assessment analyzing the following proposed action: "The Forest Service proposes to continue the aerial application of chemical fire retardant to fight fires on National Forest system lands and to permanently adopt the Guidelines for Aerial Delivery of Retardant or Foam near Waterways, which were established in 2000."[9] USFS AR 337 at 3. The stated purpose and need for the proposed action is "to allow the Forest Service to maintain the ability to rapidly reduce wildfire intensities and rates of spread until ground forces can safely take suppression action throughout the duration of an incident without harming fish and aquatic habitat." Id. at 8. The Forest Service analysis describes the action area as all National Forest System lands, covering 193 million acres. Id. at 7.

The Forest Service considered two alternatives in detail. Alternative 1 (the "no action" alternative) is to discontinue the aerial application of chemical fire

---

[9]The 2000 Guidelines require pilots to avoid dropping retardant within 300 feet of waterways, except under the following circumstances:

- Where alternative line construction tactics are not available, the pilot may anchor a foam or retardant line to a waterway, provided the drop is perform using the most accurate method of delivery (for example, a helicopter rather than a heavy airtanker). USFS AR 131 at 1.

- Retardant may be dropped in or near a waterway "when life of property is threatened and the use of retardant or foam can be reasonably expected to alleviate the threat." Id.

- Retardant may be dropped in or near a waterway "[w]hen potential damage to natural resources outweighs possible loss of aquatic life." Id.

retardant on National Forest lands.  USFS AR 337 at 15.  Alternative 2 is the

proposed action, continuing retardant use and adopting the 2000 Guidelines.[10]  Id.

Then-Forest Service Chief Abigail Kimbell issued a Decision Notice and Finding

of No Significant Impact adopting Alternative 2 as modified by the inclusion of

the reasonable and prudent alternatives imposed by the ESA agencies.  USFS AR

341 at 4.  In reaching the conclusion that the action would not significantly impact

the affected area, the Forest Service relied on the fact that accidental delivery into

a waterway is an uncommon occurrence: "Based on the low frequency of 14

accidents over 8 years and approximately 128,000 aerial drops, the likelihood of

---

[10]Five other alternatives were examined but not considered in detail:

**Alternative A**: Allow unrestricted use of retardant.  This alternative was not considered because it is contrary to agency policy and the 2000 Guidelines.

**Alternative B**: No aerial retardant within a quarter-mile of waterways or in wilderness areas, wilderness study areas, and other withdrawn land allocation areas.  This alternative was not considered because it would constrain a fire response incident commander's ability to respond quickly and protect private property adjacent to waterways.

**Alternative C**: Use water only as an aerial retardant.  This alternative was not considered because the Forest Service viewed it as part of the "no action" alternative.

**Alternative D**: Allow retardant only where benefits "far outweigh" risks.  This alternative was not considered because incident commanders already take risks into account when using retardant and because it is too subjective to be effectively analyzed.

**Alternative E**: Stop using retardant until a less toxic product is developed.  This alternative was not considered because the Forest Service viewed it as part of the "no action" alternative.

USFS AR 337 at 17-18.

retardant entering a waterway is small." USFS AR 337 at 23.  Because Chief

Kimbell concluded that the action "will not have a significant impact on the

quality of the human environment considering the context and intensity of

impacts," the Forest Service did not undertake a more detailed analysis through

the preparation of an environmental impact statement.  USFS AR 341 at 11.

**E.     Plaintiff's Claims**

Count I of the Second Amended Complaint alleges that the Forest Service

violated NEPA when it concluded in its Environmental Assessment that the

proposed action would not have a significant impact and decided not to prepare an

environmental impact statement.  Plaintiff also claims that the analysis in the

Environmental Assessment does not comply with the requirements of the statute,

and that the Forest Service should have developed alternatives to the use of

chemical fire retardant.

The remaining counts are brought under the ESA.  Counts II and III claim

NOAA Fisheries and the Fish and Wildlife Service violated the ESA by failing to

include incidental take statements in their biological opinions.  In Count IV,

Plaintiff alleges the Fish and Wildlife Service's reliance on its reasonable and

prudent alternative is arbitrary and capricious because the reasonable and prudent

alternative will not prevent jeopardy.  Count V alleges that the Fish and Wildlife

Service violated the ESA because it did not consider the effects of the action on

the value of critical habitat for recovery.  Plaintiffs make a series of claims under

Count VI, saying the Fish and Wildlife Service violated the ESA by failing to (1)

address the effects of related activities; (2) adequately assess the environmental

baseline; and (3) consider the aggregate effects of the use of retardant and other

human activities.

### III. Analysis

**A.    Legal Standards Applicable to All Claims**

    **1.    Standard of APA Review**

Agency decisions may be set aside under the APA only if they are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971)

(quoting 5 U.S.C. §706(2)(A), overruled on other grounds by Califano v. Sanders,

430 U.S. 99 (1977)).  Agency action can be set aside  "if the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29

(1983); Alvarado Community Hospital v. Shalala, 155 F.3d 1115, 1122 (9th Cir. 1998). The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted).

**2.      Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is particularly applicable to cases involving judicial review of final agency action. Occidental Engineering Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted). Summary judgment is appropriate in this case because the issues presented address the legality of the Federal Defendants' actions based on the administrative record and do not require resolution of factual disputes.

**B.   NEPA (Count I)**

**1.   Legal Standard**

NEPA is intended to focus the attention of the government and the public on the likely environmental consequences of a proposed agency action. Marsh v. Oregon Natural Resource Council, 490 U.S. 360, 371 (1989). The Act "places on the agency the obligation to consider every significant aspect of the environmental impact of the proposed action" and "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies. "NEPA does not work by mandating that agencies achieve particular substantive environmental results." Marsh, 490 U.S. at 371. NEPA dictates the necessary procedure an agency must follow, but does not state any requirements relating to the outcome of the agency's decision making process. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989).

NEPA requires a federal agency to prepare an environmental impact statement detailing the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

4332(2)(C).  This obligation includes the duty to consider "[w]hether the action is

related to other actions with individually insignificant but cumulatively significant

impacts."  40 C.F.R. § 1508.27(b)(7).  "If several actions have a cumulative

environmental effect, 'this consequence must be considered in an [environmental

impact statement].'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d

1208, 1214 (9th Cir. 1998) (quoting Neighbors of Cuddy Mountain v. United

States Forest Service, 137 F.3d 1372, 1378 (9th Cir. 1998)).  To assist in

determining whether an environmental impact statement is necessary, an agency

may prepare an environmental assessment.  40 C.F.R. § 1508.9.  An environmental

assessment is a less detailed analysis that includes a brief discussion of the need

for the proposal, the alternatives under consideration, the environmental impacts

of the proposed action and alternatives, and a listing if the agencies and

individuals consulted.  40 C.F.R. § 1508.9(b).  If the environmental assessment

shows that the proposal will not have a significant impact, the agency may issue a

finding of no significant impact under 40 C.F.R. § 1508.13.  If the agency

determines that the proposed action will significantly impact the environment, it

must go on to prepare an environmental impact statement.  42 U.S.C. §

4332(2)(C).

The environmental impact statement must describe the environmental

impacts of the proposed agency action, any adverse environmental impacts of the proposed action that cannot be avoided, and alternatives to the proposed action which were considered by the agency. Robertson, 490 U.S. at 349.  The scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency. Kleppe v. Sierra Club, 427 U.S. 390, 413-14 (1976).  If the nature and scope of the analysis is challenged, the reviewing court may only examine whether "the agency has taken a 'hard look' at the environmental consequences." Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754, 763 (9th Cir. 1996) (quoting Kleppe, 427 U.S. at 410 n. 21).  A court may not interject itself within the area of discretion of the executive as to the choice of the action to be taken; only if the agency's analysis of the environmental impact is "arbitrary and capricious" or "contrary to the procedures required by law" can the reviewing court conclude that the agency did not take the requisite "hard look." Kleppe, 427 U.S. at 410 n. 21; Inland Empire, 88 F.3d at 763.

## 2.    Plaintiff's NEPA Arguments

Plaintiff makes three arguments in support of the NEPA claim.[11]  First,

_____

[11]Plaintiff chose not to argue its NEPA claim for failure to consider alternatives to the use of fire retardant, and so has abandoned that claim. Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462, 467 (9th Cir. 1990).

Plaintiff challenges the scope of the Forest Service's analysis. Plaintiff maintains that for the agency to fully examine the indirect and cumulative impacts of the proposal and any connected actions, the Forest Service must prepare an analysis of the impact of *all* fire suppression activity on federal lands, and may not confine its analysis to the use of aerially applied fire retardant. Plaintiff also challenges the adequacy of the analysis in the environmental impact statement, saying the Forest Service failed to sufficiently evaluate the effects of the proposed action on fish and water quality and failed to discuss how the reasonable and prudent alternatives will mitigate the harm to listed fish and plants. Plaintiff's final argument in support of the NEPA claim argues that the Forest Service erred in its finding that the proposed action will not have a significant impact on the environment, and that the Forest Service should have proceeded to analyze the proposal in greater detail in an environmental impact statement.

### a.   The Scope of the Forest Service's NEPA Analysis

A common thread running through Plaintiff's NEPA and ESA arguments is the Plaintiff's insistence that the proper scope of analysis is not confined to the Forest Service's use of fire retardant, but should extend to the effects of fire suppression generally on National Forest System lands. Here Plaintiff expresses that view in the context of arguments that the Forest Service failed to analyze the

indirect effects of fire retardant use and failed to analyze significant impacts of cumulative and connected actions.

## i.     Indirect Effects

Indirect effects are "caused by the action and are later in time or farther removed in the distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Plaintiff argues that the use of aerial fire retardant results in smaller fires, "mean[ing] that fire's natural role in forest ecosystems is diminished or even eliminated." Pl.'s Resp. Br. (Doc. No. 36) at 5. According to Plaintiff, the Forest Service should have analyzed fire's diminished role in the ecosystem as an indirect effect of the action. This contention is supported by reference to a private 1994 study commissioned by the Forest Service assessing the comparative risks posed by uncontrolled wildfires and the use of chemical fire retardant, USFS AR 194.

Plaintiff focuses on a single sentence in the study's section on "Evaluation of Relative Risks," in which the authors write, "Data accumulated over the past few decades have shown that continual fire suppression may have more adverse effects to ecosystems than wildfires." USFS AR 194 at 23. Plaintiff's emphasis is misplaced because as the Defendants point out, the study speaks of the effects of fire suppression generally, not the use of fire retardant in particular. Moreover, Plaintiff overlooks the statement in the next paragraph that "[f]ire suppression

-23-

chemicals may, in fact, leave less permanent effects on an ecosystem than some physical fire suppression activities[.]" Id. At best, Plaintiff can point to a single statement that fire suppression *may* be more harmful than wildfires, which does not translate into a conclusion that the use of fire retardant alone causes harmful indirect effects in the form of less fire. This Court did not require—and the Forest Service did not perform—an analysis of the agency's fire suppression practices generally. Plaintiff wants an analysis of an effect without any evidence that it is caused by the proposed action. NEPA imposes no such requirement. The Defendants are entitled to summary judgment on this point.

### ii.    Cumulative Impacts of Connected Actions

An agency must consider an action's cumulative impact, which is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. In assessing impacts an agency is required to take into account connected actions, which are "closely related" to the proposed action. Connected actions include "independent parts of a larger action [that] depend on the larger action for justification." 40 C.F.R. § 1508.25(a)(1)(iii). Plaintiff argues that the use of fire retardant should be considered as a connected action together with every other activity associated with fire suppression, and that the cumulative

impact of all activities comprising the Forest Service's fire suppression regime must be considered together in the NEPA analysis.

The Defendants concede that the Forest Service did not analyze the effects of fire suppression activity generally, but argue the agency has "considerable discretion" in determinating the proper scope of its NEPA analysis. Thomas v. Peterson, 753 F.2d 754, 758 (9th Cir. 1985). The Ninth Circuit uses an "independent utility" test for deciding whether actions are connected for the purpose of NEPA review. Earth Island Institute v. United States Forest Service, 351 F.3d 1291, 1305 (9th Cir. 2003). Each side claims support for its position in the Ninth Circuit's discussion of the test in Northwest Resource Information Center v. National Marine Fisheries Service, 56 F.3d 1060 (9th Cir. 1995).

Northwest Resource involved a challenge to an agency decision relating to the operation of dams, reservoirs, and other structures in the Federal Columbia River Power System. At the time the Army Corps of Engineers relied on three major tactics to help juvenile salmon migrate through the system: river flow improvement, spill control, and surface transportation of fish past the dams. 56 F.3d at 1063. In response to the ESA listing of salmon species, the Corps issued an environmental impact statement on the effects of its plan to improve river flow to benefit the fish. Id. at 1065. The environmental impact statement assumed the

transportation program would continue and did not address the transportation program or its effects in the analysis. Id. The plaintiffs then challenged the document, arguing that the failure to address the transportation program in the analysis violated NEPA because the transportation program and the river flow improvement program were connected actions.

In reaching its conclusion, the court in Northwest Resource considered a series of Ninth Circuit cases. The discussion includes elements favorable to each party's position in this case. The first case cited is Thomas, in which the court held that a logging project and a road to provide access to the timber were connected actions because "the timber sales cannot proceed without the road, and the road would not be built but for the contemplated timber." 56 F.3d at 1068 (quoting Thomas, 732 F.2d at 758). Next the court discussed Sylvester v. U.S. Army Corps of Engineers, 884 F.2d 394 (9th Cir. 1989), where the court held that a golf course and the accompanying proposed resort were not connected actions under NEPA because "each could exist without the other, although each would benefit from the other's presence." 56 F. 3d at 1068 (quoting Sylvester, 884 F.2d at 400). The Sylvester court explained that while the road and logging project in Thomas were "links in the same bit of chain," the golf course and resort were "separate segment[s] of chain." 884 F.2d at 400.

The Northwest Resource court then went on to consider Trout Unlimited v. Morton, 509 F.2d 1276, 1285 (9th Cir. 1974), in which a dam and reservoir project and a subsequent phase involving disposition of the reservoir's irrigation capacity were found not to be connected actions. The Trout Unlimited court explained that a subsequent phase of development is a connected action only when "[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." 509 F.2d at 1285. The final case mentioned is Daly v. Volpe, 514 F.2d 1106 (9th Cir. 1975), where the court held that the impact of one segment of a larger highway project could be considered apart from the rest of the highway because the segment had independent utility.

After considering these cases, the Northwest Resource court concluded that the transportation program and the river flow improvement program were not connected actions. 56 F.3d 1068. The court analogized the case to Sylvester and Daly, stating, "The Corps would continue the transportation program with or without flow improvements. And, the Corps would explore flow improvements with or without the transportation program." Id. Plaintiff seizes upon that language as compelling a finding of connectedness here, because while fire suppression could exist without fire retardant, fire retardant would not exist

-27-

without fire suppression.  Quoting Trout Unlimited, Plaintiff contends it would be

"irrational, or at least unwise," to use fire retardant unless the "subsequent" step of

ground force fire suppression actions were not also undertaken.  Plaintiff tries to

cast the issues in the light most favorable to its position by suggesting that the two

actions up for consideration are the use of fire retardant on one hand and fire

suppression generally on the other.  Framing the issue in that way allows the

Plaintiff to argue that fire retardant would not exist without fire suppression.

The trouble with Plaintiff's argument is that the "other firefighting actions"

to which Plaintiff refers are not a single action  that can be lumped under the

heading "fire suppression."  The Forest Service's policy of suppressing wildfire is

comprised of a series of actions, including ground crews, hand tools, water trucks,

bulldozers, helitack crews, smokejumpers, and fire retardant, among others.

Although these actions are all related to each other, none of them individually is

contingent on the existence of any of the others.  The closing paragraph of the

court's analysis in Northwest Resources is on point:

> [W]e cannot agree ... that the transportation program and the flow
> improvement measures are so interdependent as parts of the larger
> action of improving the survival of the salmon that they must be
> addressed in the same NEPA document.  On this rationale, measures
> involving harvest limits, hatchery releases, and habitat maintenance
> are also interdependent parts of every action taken to benefit the
> salmon.  While we cannot allow an agency to segregate its actions in

order to support a contention of minimal environmental impact, we
also cannot force an agency to aggregate diverse actions to the point
where problems must be tackled from every angle at once.

56 F.3d at 1069 (citation omitted).

Just as river flow improvement is one of many actions taken to benefit

salmon, fire retardant is one of many tactics used to fight wildfires. The Forest

Service is not required to treat fire retardant and other firefighting tactics as

connected actions. This conclusion is consistent with the ruling in the 2003 case,

which directed the Forest Service to prepare a NEPA analysis of the agency's use

of fire retardant, not the agency's broader policy of fire suppression. If the Forest

Service had analyzed all fire suppression tactics as connected actions, the scope of

the NEPA discussion would have swallowed the issue of fire retardant and

mandated, among other things, consideration of a "no action" alternative

consisting of the cessation of all fire suppression activities on federal lands. That

is not the NEPA analysis that was ordered or that the law requires. The scope of

the Environmental Assessment is adequate. The Federal Defendants are entitled to

summary judgment on this point.

### b.    Adequacy of the Forest Service's Analysis

Plaintiff's next argument challenges the adequacy of the Forest Service's

NEPA analysis. Here Plaintiff argues that the Forest Service's analysis is

inadequate even under the lower standards of what must be included in an

Environmental Assessment.  This argument challenges the depth of the

Environmental Assessment's analysis, while the next section deals with Plaintiff's

closely related contention that Forest Service's finding of no significant impact

was arbitrary and capricious, and that the agency should prepare an environmental

impact statement.[12]  Plaintiff contends the Forest Service failed to adequately

evaluate the effects on the action on fish and plants, and failed to evaluate the

mitigation measures (reasonable and prudent alternatives).

### i.   Analysis of the Effect on Fish

The discussion of the effects on fish is inadequate, Plaintiff argues, because

the Forest Service's NEPA documents ignore the fact that drops in waterways will

continue to occur and have significant adverse consequences.  The Forest Service

discusses the effects of fire retardant drops on fish and aquatic habitat in the

Environmental Assessment.  USFS AR 337 at 20-24.  The analysis recognizes

risks to fish from retardant drops, describes the factors affecting mortality, recites

---

[12]Plaintiff's NEPA arguments are not clearly delineated in the briefing.  Plaintiff raises interwoven points attacking the decision not to prepare an environmental impact statement, the adequacy of the analysis in the Environmental Assessment, and the scope of the Forest Service's NEPA analysis.  Although this analysis attempts to undertake a distinct consideration of Plaintiff's claim that the Environmental Assessment's analysis is inadequate, there are aspects of the claim that amount to little more than a restatement of the arguments related to the agency's failure to prepare an environmental impact statement.

the provisions of the 2000 Guidelines intended to limit drops in waterways, and

provides data indicating that drops in waterways in infrequent relative to the total

number of drops ("14 accidents over 8 years"). Id. The discussion is brief, but the

regulations require nothing more. 40 C.F.R. § 1508.9. The Forest Service's

discussion of the effects on fish is adequate.

### ii.    Analysis of the Effect on Plants

The Environmental Assessment contains much less discussion of the effects

of the action on listed plants. The Environmental Assessment's analysis of the

effects on vegetation amounts to a few sentences, and contains no discussion of

the risk of invasion by non-native species that the Fish and Wildlife Service

concluded is the greatest risk to listed plants from exposure to fire retardant.

USFS AR 337 at 25. The Defendants say that the discussion is contained

elsewhere in the record, pointing to the Biological Opinion by the Fish and

Wildlife Service and the Finding of No Significant Impact. Relying on

Environmental Protection Information Center v. United States Forest Service, 451

F.3d 1005 (9th Cir. 2006) ("EPIC"), the Defendants argue it is permissible for it to

incorporate the Biological Opinion's analysis of the effects on listed plants.

In EPIC, the plaintiff challenged the Forest Service's decision not prepare

an environmental impact statement, arguing that the agency improperly relied on a

"no jeopardy" finding from the biological opinion. 451 F.3d at 1012. The court held that while NEPA and the ESA have different standards, the Forest Service is not required to disregard the findings of a biological opinion. Id. The court went on to observe that the Forest Service did not rely solely on the "no jeopardy" finding, but on "all of the analysis in the [biological opinion], as well as numerous other sources of information," in making its finding of no significant impact. Id.

EPIC stands for the proposition that an action agency may consider the analysis contained in the biological opinion, as well as other information in the record, in reaching its decision. Nonetheless, Plaintiff correctly observes that EPIC does not allow an action agency to completely ignore an issue in its NEPA documents so long as the matter is discussed in adequate detail in a biological opinion, but that is not the situation here. The Forest Service incorporated by reference into its Decision Notice and Finding of No Significant Impact the analysis contained in the Fish and Wildlife Service's Biological Opinion. USFS AR 341 at 2. It also included the full text of the reasonable and prudent alternative. Id. at 6-7. Finally, in recognition of the Biological Opinion's finding that invasion by non-native species is the greatest risk to listed plants from exposure to retardant, the Forest Service discussed that concern in the Decision Notice Finding of No Significant Impact. The agency briefly discusses the

preliminary findings of a study of vegetative change following retardant drops on Mount Jumbo, noting "an increase in invasive species," and states that the findings are consistent with two other studies considered in the preparation of the Environmental Assessment. Id. at 10. The Forest Service then summarize its mitigation plan, including monitoring and non-native species removal. Id.

The Forest Service's discussion of the effects on listed plants is brief but adequate. The record contains a sufficient analysis of the effects on listed plants in the Fish and Wildlife Service Biological Opinion, and the Forest Service acknowledges, incorporates, and briefly expands upon that analysis in its NEPA documents. The discussion contained in the NEPA documents is not extensive, but there is sufficient reference to the issues at hand and the places in the record where a more detailed discussion can be found. The discussion adequately meets the less exacting standards of an environmental assessment.

### iii.    Analysis of the Reasonable and Prudent Alternatives

Plaintiff argues that the Forest Service failed to adequately analyze the effectiveness of the reasonable and prudent alternatives in its NEPA documents. It criticizes the Forest Service for providing a "mere listing of mitigation measures, without supporting analytical data," which the court in National Parks and Conservation Association v. Babbitt, 241 F.3d 722, 734 (9th Cir. 2001), held is

not sufficient to support a finding of no significant impact. The point does not

advance the Plaintiff's position because there was no biological opinion in

National Parks, and thus no other place to go to find the required analysis. Here,

the Forest Service explicitly relies on the biological opinions and the analyses

contained therein. USFS AR 341 at 2. The fact that the Forest Service did not

include a detailed analysis of the effectiveness of the reasonable and prudent

alternatives in its NEPA documents does not necessarily mean that the agency

failed to sufficiently analyze the problem.[13]

Plaintiff's briefing suggests that its concerns over the adequacy of the

discussion of the reasonable and prudent alternatives are indistinguishable from its

argument that the proposed action will have significant impacts that are not

alleviated by the reasonable and prudent alternatives. Plaintiff writes:

> The problem is that no where – not in the [Environmental
> Assessment], not in the [Finding of No Significant Impact], not in the
> [administrative record] – does the Forest Service analyze the use of
> aerial fire retardant pursuant to the [reasonable and prudent

---

[13]The same reasoning undermines Plaintiff's reliance on Center for Biological Diversity
v. National Highway Traffic Safety Administration, 538 F.3d 1172 (9th Cir. 2008). Plaintiff
cites Center for Biological Diversity because the court in that case held that the Forest Service
acted arbitrarily and capriciously in issuing an environmental assessment and finding of no
significant impact that contained only conclusory statement unaccompanied by supporting data.
As in National Parks, there was no biological opinion in Center for Biological Diversity.

alternatives], i.e., "in place," as required by EPIC.[14] For example, the Forest Service asserts that "maps will give incident commanders an effective tool to implement fire suppression tactics that will better protect [listed plants]." FS SJ at 4. But the [administrative record] includes no maps, thus neither the [Forest Service] (nor anyone else) can judge their accuracy. The [Forest Service] has not assessed how faithfully incident commanders use the maps during fire fighting. The [Forest Service] claims mitigation "by prioritizing lands with [listed plants] for fuel reductions, **when practical** . . ." FS SJ at 4 (emphasis added). What lands? What fuel reduction practices? What effects will the fuel reduction practices themselves have upon the threatened and endangered plans [sic]? When is it "practical" to carry out these practices, and when not? These basic questions remain unanswered. The [Forest Service] claims it will use "water or less toxic fire retardants, **when practical** . . ." FS SJ at 4 (emphasis added). When? Where? How much? And what constitutes "practical"?

Pl.'s Resp. Br. (Doc. No. 36) at 4-5.

These are questions that would be answered by the more detailed analysis that comes with an environmental impact statement. Plaintiff's argument has as much to do with whether the reasonable and prudent alternatives will effectively mitigate as it does with whether they are adequately discussed. The issue is the same whether it is cast in terms of the Forest Service's alleged failure to take a hard look at the reasonable and prudent alternatives, or in terms of the agency's alleged failure to prepare an environmental impact significant to analyze impacts

---

[14] In EPIC, the court found an environmental assessment's discussion of mitigation measures to be adequate where the proposal "incorporate[d] mitigation measures throughout the plan of action, so that the effects are analyzed with those measures in place." 451 F.3d at 1015.

that Plaintiff believes will not be alleviated by the reasonable and prudent

alternatives.  For that reason, the claim analysis must proceed to the Plaintiff's

next argument, and to consideration of whether the Forest Service's decision not

to prepare an environmental impact statement is arbitrary and capricious.

> ### c.   The Forest Service's Decision Not to Prepare an Environmental Impact Statement

In reviewing an action agency's decision not to prepare an environmental

impact statement, a reviewing court focuses on the reasonableness of the agency's

conclusion that the action will have no significant adverse impact on the

environment.  Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir.

1988).  "If substantial questions are raised regarding whether the proposed action

*may* have a significant effect upon the human environment, a decision not to

prepare an [environmental impact statement] is unreasonable."  Id.  The decision

not to prepare an environmental impact statement must be explained in "a

convincing statement of reasons why potential effects are insignificant."  Id.

(quoting the Steamboaters v. FERC, 759 F.2d 1382, 1393 (9th Cir. 1985)).  An

agency's statement of the reasons for its decision informs the court's consideration

of whether the agency took the requisite "hard look."  Id.

Whether a proposed action will have a significant impact on the

environment requires consideration of the action's context and intensity. <u>Native</u>

<u>Ecosystems Council v. United States Forest Service</u>, 428 F.3d 1233, 1239 (9th Cir.

2005); 40 C.F.R. § 1508.27.  An action's intensity is evaluated based on ten

factors, only one of which is clearly invoked in the Plaintiff's briefing, i.e., "[t]he

degree to which the action may adversely affect an endangered or threatened

species or its habitat that has been determined to be critical under the Endangered

Species Act of 1973." 40 C.F.R. § 1508.27(b)(9).[15]  Any one of the ten factors

standing alone may be sufficient to require preparation of an environmental impact

statement.  <u>National Parks</u>, 241 F.3d at 731.

Plaintiff insists the Forest Service should have prepared an environmental

impact statement because the proposed action will have significant effects on

listed fish and listed plants.  The argument on this point is that the Forest Service's

Finding of No Significant Impact cannot be reconciled with the determinations of

the Fish and Wildlife Service and NOAA Fisheries that the proposal is likely to

jeopardize several dozen listed species; it is impossible, Plaintiff argues, for an

action to jeopardize the continued existence of many listed species while not

---

[15]Plaintiff does not make specific reference to 40 C.F.R. § 1508.27(b)(9), or to any of the
other ten factors set forth in § 1508.27(b).  It is clear from Plaintiff's briefing, however, that its
claim that the Forest Service should have prepared an environmental impact statement is based
on the potential for negative effects on listed species as determined by the ESA agencies in their
biological opinions.

impacting the environment in any significant way.

With respect to fish, Plaintiff points to several places in the Fish and
Wildlife Service and NOAA Fisheries Biological Opinions discussing the
potential harmful effects on fish and water quality resulting from the introduction
of fire retardant into waterways.  The Fish and Wildlife Service discusses the
effects in its Biological Opinion at USFS AR 339 at 32 (stating that "accidental
delivery into a waterway has the highest potential for adverse effects to aquatic
organisms," and citing a study's finding that "an accidental spill in a waterway
would lead to substantial mortality"); USFS AR 339 at 36 ("Entry of ammonia into
waterways containing [immobile invertebrates such as mussels] could have a
severe effect."); and USFS AR 339 at 89 ("Direct mortality of listed fish is
anticipated, as well as sub-lethal physiological responses that effect survival
(harass).  The fire retardants are likely to kill macroinvertebrate food items ...
resulting in significant habitat degradation that affects breeding and foraging
(harm)."); USFS AR 339 at 107 ("The hardest to measure and potentially most
significant effects of fire retardant could be long-term, sub-lethal impacts to
fish.").

The Biological Opinion from NOAA Fisheries contains similar statements
at USFS AR 1075 at 127 (discussing a study's finding that "fire retardant

misapplications have biologically significant effects to fish communities"); and

USFS AR 1075 at 132 ("The hardest to measure, and potentially most significant

effects of fire retardant misapplication could be the sub-lethal impacts to fish and

the duration of the impacts to critical habitat."). In discussing the heightened

vulnerability of fish during certain life stages, the Forest Service stated in its

Biological Evaluation, "Accidental introduction of these chemicals into an aquatic

system during a salmonid swim-up period could cause significant mortality and be

catastrophic to a local population, especially if that population were threatened or

endangered[.]" USFS AR 222 at 9.

Plaintiff has identified similar language in the record indicating that the

proposal is likely to harm certain plant species. Among those species are the

Mariposa Pussy-Paws (*C. pulchellum*), for which the Fish and Wildlife Service's

Biological Opinion issued a jeopardy finding, stating, "The proposed action would

lead to a substantial reduction in the number of *C. pulchellum*, a substantial

reduction in range by removing this site as suitable habitat for *C. pulchellum*, and

it would preclude the recovery of *C. pulchellum*." USFS AR 339 at 44. Similar

conclusions appear in the Fish and Wildlife Service's Biological Opinion at USFS

AR 339 at 45 (stating that a single retardant drop on the Slender-horned

Spineflower could cause a non-native species invasion that "would represent an

appreciable reduction in the distribution of this species"); USFS AR 339 at 46 (a

retardant drop on the California Dandelion could result in a non-native species

invasion that is likely to "adversely modify or destroy critical habitat"); USFS AR

at 47 ("a fire retardant drop that promotes non-native plant species could result in

significant effects" on Munz's Onion); USFS AR 339 at 48-49 (same risk of

significant effects from non-native invasion to seven listed plant species). The

Fish and Wildlife Service concluded that the proposed action was likely to

jeopardize each of these plant species. USFS AR 339 at 39-41.

Defendants accuse the Plaintiff of "cherry pick[ing]" information in the

record to support its position, a practice the court in Native Ecosystems found

insufficient to demonstrate the type of significant impact that requires an

environmental impact statement. 428 F.3d at 1240. Defendants say the mere

suggestion in the record of some negative effects on listed species is not evidence

of a significant impact, citing EPIC, 451 F.3d at 1010. In EPIC the court

explained that NEPA directs an agency to "consider the degree of adverse effect

on a species, not the impact on individuals of that species ." Id.[16]

---

[16]The Defendants also attempt to rely upon the Forest Service's inability to predict the
location and severity of future wildfires to justify the Forest Service's decision not to prepare an
environmental impact statement. Defendants cite Ocean Advocates v. United States Army Corps
of Engineers, 402 F.3d 846, 870 (9th Cir. 2005), for the proposition that an environmental impact
statement is not required unless further data collection will resolve the uncertainty. Since no
amount of further study will yield reliable predictions about where retardant will be used in the

The Defendants' reliance on EPIC and Native Ecosystems ignores a critical

distinction, which is that the biological opinions in this case contain jeopardy

findings for many fish and plant species. This is not a case like EPIC, in which

the Fish and Wildlife Service made a "no jeopardy" finding, 451 F.3d at 1012; nor

is this case like Native Ecosystems, which did not involve any species listed under

the ESA and therefore has no application to a claim under § 1508.27(b)(9). 428

F.3d at 1236 n.4. Here, the ESA agencies found that jeopardy and/or adverse

modification are likely to occur, and then issued reasonable and prudent

alternatives that will, in the judgment of the agencies, alleviate those harms. Thus,

in the context of the particular factor invoked by the Plaintiff, the question for the

Court is whether the Forest Service has provided a convincing statement of

reasons that adequately explains its finding that the reasonable and prudent

alternatives will prevent the action from having a significant adverse impact on

listed species or critical habitat.

To the Plaintiff, the ESA agencies' findings that the proposed action is

---

future, the Forest Service argues, it is not required to study the matter in greater detail. The
citation is inapposite here, as Ocean Advocates was a case in which the plaintiff raised questions
about the "uncertainty" factor, 40 C.F.R. § 1508.27(b)(5). The factor at issue here is §
1508.27(b)(9), requiring consideration of the degree of adverse effects on listed species and
critical habitat. Plaintiff is not arguing that the project's effects are uncertain; to the contrary,
Plaintiff contends that the jeopardy findings of the ESA agencies show that the proposed action is
certain to have significant harmful effects on listed plants and fish and their habitat.

likely to jeopardize listed fish and plants leave the Forest Service no discretion; an

environmental impact statement must be prepared.  The Defendants disagree,

arguing that the ESA agencies' jeopardy/adverse modification findings do not

compel preparation of an environmental impact statement because (1) the

likelihood of a drop in a waterway is very low and (2) the Forest Service

incorporated the reasonable and prudent alternatives required by the ESA

agencies, which are intended to alleviate the risk of jeopardy or adverse

modification.

The Forest Service's explanation for its decision not to prepare an

environmental impact statement is contained in the Decision Notice and Finding

of No Significant Impact, USFS AR 341.  With regard to the effects on listed

species, the Forest Service stated:

> The decision should not jeopardize the continued existence of any
> endangered or threatened species or its habitat that has been
> determined to be critical under the Endangered Species act of 1973.
> The aerial application of fire retardant will conform to the [2000
> Guidelines] and the reasonable and prudent alternatives from [the
> ESA agencies'] biological opinions.  The [ESA agencies'] biological
> opinions affirm that by incorporating the reasonable and prudent
> alternatives into the final decision, the alternative action will avoid
> the likelihood of jeopardizing the continued existence of listed
> species or destroying or adversely modifying critical habitat.

USFS AR 341 at 12.  The Decision Notice and Finding of No Significant Impact

also contains a recitation of the reasonable and prudent alternatives imposed by

the ESA agencies and incorporated into the decision.  Id. at 4-9.  In the

Environmental Assessment, the Forest Service explained that the likelihood of fire

retardant affecting aquatic species is "small" due to "the low frequency of 14

accidents over 8 years and approximately 128,000 aerial drops."  USFS AR 337 at

23.[17]

It is not difficult to discern the Forest Service's reasoning; the agency relies

almost entirely on the analyses in the biological opinions and the expected success

of the reasonable and prudent alternatives in concluding that the proposed action

is not likely to have a significant impact on listed species.  The adoption of

mitigation measures can in some instances justify an agency's decision not to

prepare an environmental impact statement, but only where the measures

"constitute an adequate buffer against the negative impacts that may result from

the authorized activity."  National Parks, 241 F.3d at 733-734.

The reasonable prudent alternatives issued in this case do not provide the

requisite buffer.  Both ESA agencies issued mitigation measures that place no

-------------------------------

[17]Despite its finding regarding the low likelihood that fire retardant will enter a waterway, the Forest Service determined that the very possibility that retardant could enter a waterway containing a listed species warranted a "likely to adversely affect" determination at the "programmatic level," thus triggering formal ESA consultation.  USFS AR 337 at 23.

meaningful restrictions on the decisions of incident commanders, despite the agencies' conclusions that such decisions involving fire retardant can have disastrous effects on listed species. See USFS AR 339 at 120 (Fish and Wildlife Service making clear that its Biological Opinion "in no way limits the actions that an incident commander deems necessary to undertake during a fire emergency response"); USFS AR 1075 at 141-143 (listing of the provisions of NOAA Fisheries' reasonable prudent alternative contains no restrictions on retardant use). By failing to impose any binding restrictions on the use of fire retardant where it may affect listed species or critical habitat, the ESA agencies have failed to alleviate the risk of jeopardy to listed species.  It therefore remains likely that the action will "adversely affect an endangered or threatened species or its habitat that has been determined to be critical," 40 C.F.R. § 1508.27(b)(9), and the adverse effect will be of such a severe degree that jeopardy or adverse modification is likely to occur for some species.  These are significant impacts that require the preparation of an environmental impact statement, and the Forest Service's failure to prepare one under these circumstances is a violation of NEPA.

The Plaintiff is entitled to summary judgment on Count I, the NEPA claim, because the jeopardy findings of the ESA agencies constitute significant impacts that are not alleviated by the reasonable and prudent alternative, requiring the

preparation of an environmental impact statement.[18]  The Forest Service's finding

on this issue is set aside and the Environmental Assessment is reminded to the

agency for further proceedings consistent with the law.

**C.    ESA (Counts II-VI)**

   **1.    Legal Standard**

Section 7(a)(2) of the Endangered Species Act requires federal agencies to

consult with the Fish and Wildlife Service or the NOAA Fisheries Service to

ensure that any action authorized, funded or carried out by the agency is not likely

to jeopardize the continued existence of any endangered species or threatened

species or result in destruction or adverse modification of critical habitat for such

species.[19]  16 U.S.C. § 1536(a)(2).  The statute and its implementing regulations

establish a framework for assessing the impacts of a proposed activity on listed

species.  16 U.S.C. § 1536; 50 C.F.R. Part 402.

---

[18]The shortcomings of the Fish and Wildlife Service's reasonable and prudent alternative
are discussed in detail in the ESA section.

[19]The ESA defines "critical habitat" in part as:

the specific areas within the geographical area occupied by the species, at the time
it is listed in accordance with the provisions of section 1533 of this title, on which
are found those physical or biological features (I) essential to the conservation of
the species and (II) which may require special management considerations or
protection[.]

16 U.S.C. § 1532(5)(A)(i).

An agency proposing an action must first determine whether the action

"may affect" species listed as endangered or threatened under the ESA.  50 C.F.R.

§ 402.14(a).  If the agency determines that the proposed action may affect listed

species, formal consultation with the Fish and Wildlife Service is required except

in certain instances.  Id.  The relevant exceptions allow an action agency to forego

formal consultation

> if, as a result of the preparation of a biological assessment under §
> 402.12[20] or as a result of informal consultation with the Service under
> § 402.13,[21] the Federal agency determines, with the written
> concurrence of the Director, that the proposed action is not likely to
> adversely affect any listed species or critical habitat.

50 C.F.R. § 402.14(b)(1).

Formal consultation means the Fish and Wildlife Service must prepare a

---

[20]50 C.F.R. § 402.12(a) states that a biological assessment "shall evaluate the potential
effects of the action on listed and proposed species and designated and proposed critical habitat
and determine whether any such species or habitat are likely to be adversely affected by the
action and is used in determining whether formal consultation or a conference is necessary."

[21]50 C.F.R. § 402.13(a) provides:

Informal consultation is an optional process that includes all discussions,
correspondence, etc., between the Service and the Federal agency or the
designated non-Federal representative, designed to assist the Federal agency in
determining whether formal consultation or a conference is required. If during
informal consultation it is determined by the Federal agency, with the written
concurrence of the Service, that the action is not likely to adversely affect listed
species or critical habitat, the consultation process is terminated, and no further
action is necessary.

biological opinion in which the Service advises a federal agency as to whether the

proposed action, whether alone or cumulatively with other actions, is likely to

jeopardize the continued existence of[22] any listed species or is likely to result in

the destruction or adverse modification of any critical habitat. 50 C.F.R. §

402.14(h)(3). In its biological opinion, the Fish and Wildlife Service "must state a

rational connection between the facts found and the decision made." Gifford

Pinchot Task Force v. United States Fish and Wildlife Service, 378 F.3d 1059,

1065 (9th Cir. 2004) ("Gifford Pinchot"). If the Fish and Wildlife Service

determines that a proposed action is likely to result in jeopardy or loss of critical

habitat, the Service must set forth reasonable and prudent alternatives to the

action, if any. 16 U.S.C. § 1536(b)(3)(A). If the Service determines that a

proposed action will result in incidental take of listed species but that the action

and associated incidental take will not violate the ESA Section 7 jeopardy

standard, the Service must attach an incidental take statement to the biological

opinion.[23] 16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1). The incidental take

---

[22]50 C.F.R. § 402.02 provides that "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

[23]The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

statement sets forth the predicted impact to listed species, the reasonable and

prudent measures that are necessary to minimize take, and the terms and

conditions for the implementation of those measures.  Id.  If the action agency

complies with the terms and conditions of the incidental take statement, the

expected take is exempted from the take prohibition set forth in ESA Section 9 (16

U.S.C. § 1538(a)(1)(B)).  16 U.S.C. § 1536(o)(2).

With regard to actions over which the federal agency remains in control or

with which the federal agency has discretionary involvement, re-initiation of

formal consultation is required in the following instances:

(a) If the amount or extent of taking specified in the incidental take
statement is exceeded;

(b) If new information reveals effects of the action that may affect
listed species or critical habitat in a manner or to an extent not
previously considered;

(c) If the identified action is subsequently modified in a manner that
causes an effect to the listed species or critical habitat that was not
considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be
affected by the identified action.

50 C.F.R. § 402.16.

### 2.    Standing

The Federal Defendants challenge the Plaintiff's standing to bring the ESA

claims alleged in Counts II-VI, arguing that the declarations filed by the Plaintiff's

members fail to establish the requisite interest in the places and species at issue.

Quoting Ecological Rights Foundation v. Pacific Lumber Company, 230 F.3d

1141, 1147 (9th Cir. 2000), Defendants reason Plaintiff must show that its

members have an "aesthetic or recreational interest in a particular place, animal, or

plant species and that that interest is impaired by a defendant's conduct." Plaintiff

has attempted to make the requisite showing by submitting declarations from four

of its members stating that they work and recreate in areas containing species

affected by the proposed action and that they have an active interest in such

species. See Doc. No. 27 (Richard Halsey, stating an interest in 17 listed plant

species in national forests in southern California, all of which received a

"jeopardy" determination from the Fish and Wildlife Service, as well as three

other listed species with designated critical habitat); Doc. No. 29 (John Grove,

stating an interest in Montana's "trout fisheries"); Doc. No. 32 (Sally Stefferud of

Phoenix, Arizona, stating an interest in two listed fish species, both receiving a

"jeopardy" determination from the Fish and Wildlife Service); Doc. No. 35 (James

Johnston, stating an interest in one listed plant species and four listed fish species).

An organization seeking to assert standing on behalf of its members must

demonstrate, among other things, that the individual members would have

-49-

standing to sue in their own right. Ecological Rights Foundation, 230 F.3d at

1147. An individual member has standing if he can show an injury in fact that is

"(a) concrete and particularized and (b) actual and imminent, not conjectural or

hypothetical, ... the injury is fairly traceable to the challenged action of the

defendant; and ... it is likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision." Id. (quoting Friends of the Earth v. Laidlaw

Environmental Services, 528 U.S. 167, 180-181 (2000)). The threshold for

standing in environmental cases is flexible. Ecological Rights Foundation, 230

F.3d at 1150. "[E]nvironmental plaintiffs adequately allege injury in fact when

they aver that they use the affected area and are persons 'for whom the aesthetic

and recreational values of the area will be lessened' by the challenged activity."

Laidlaw, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735

(1972)). It is not necessary for the claimant to reside near the affected area,

provided he can show that he has enjoyed and plans to continue to enjoy the

recreational and aesthetic values of the area. "Repeated recreational use itself,

accompanied by a credible allegation of desired future use, can be sufficient, even

if relatively infrequent, to demonstrate that environmental degradation of the area

is injurious to that person." Ecological Rights Foundation, 230 F.3d at 1149.

The Defendants make two arguments in support of their challenge the

Plaintiff's standing.  First, they claim the individual members have failed to provide evidence of concrete plans to observe the species at issue in the future. This argument fails because the declarations contain sufficient evidence of past use and plans for future use.  See Halsey Declaration, Doc. No. 27 at ¶ 6 (15 visits last year and 15 planned visits this year); Stefferud Declaration, Doc. No. 32 at ¶ 2 (intending to continue visitation frequency of six times per year); Johnston Declaration, Doc. No. 35 at ¶ 2 (stating plans for "several business and recreational visits to national forest scheduled for 2009").

The primary case upon which the Defendants rely, Lujan v. Defenders of Wildlife, 504 U.S. 555(1992), is distinguishable.  In Lujan, members of an environmental group sought to establish standing to challenge government-funded activities abroad, which the plaintiffs argued would affect endangered species in Egypt and Sri Lanka.  Id. at 563.  The Court considered affidavits from two members who years before had traveled to Egypt and Sri Lanka, respectively, but neither of whom had concrete plans to do so again beyond a general statement of intent to return at some point in the future.  Id. at 563-564.  The Supreme Court held that the absence of credible plans to visit the affected areas in the future meant plaintiffs could not show an injury in fact: "Such 'some day' intentions—without any description of concrete plans, or indeed any specification

of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564 (emphasis in original).

In contrast to Lujan, the individual members here are regular visitors to the areas with credible plans to continue their use and enjoyment of the species in question. The Lujan plaintiffs each alleged a single visit that was years in the past, with nothing more than a general intent to return to a nation halfway around the world. The individual members here have established regular and repeated use of national forest lands containing the affected species, along with an intent to continue that use on multiple occasions within the next year.

The Defendants' second argument against standing is that the Plaintiff's members have not alleged an interest in a sufficient number of species. In their Reply, the Defendants complain that Plaintiff's members "allege only an interest in a handful of the hundreds of species addressed by these biological opinions[.]" Doc. No. 40 at 10. The Defendants also note that the species listed in the individual members' declarations are almost entirely distinct from the species discussed in the Plaintiff's briefing. The thrust of the argument appears to be that by virtue of the Defendants' choice to take a programmatic planning approach covering over 400 endangered species, the Plaintiffs must respond with a "programmatic" injury in fact covering every species at issue.

Defendants cite no authority for this argument, and there are good reasons why it fails. The agencies have the resources and discretion to prepare nationwide planning documents, but it is unreasonable and impractical to require an environmental group to enlist a member with an interest in every covered species in order to satisfy the standing requirement. The standing requirement is intended to restrict the exercise of judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." Summers v. Earth Island Institute, 129 S.Ct. 1142, 1148 (2009). To require a showing of interest in every affected species, as the Defendants urge, would create an unnecessary and unjustified strategic incentive for an agency to prepare a programmatic biological opinion at every opportunity, as it would discourage legal challenge by forcing any potential plaintiff to scour the landscape seeking an afficionado of every last affected species.

The burden that such an approach would place on environmental plaintiffs is exemplified by the Defendants' argument with regard to the lack of commonality between the species mentioned in the declarations and the species discussed in the Plaintiff's briefing. Defendants attempt to undermine the individual members' standing by pointing out that the species in which they claim

an interest are not, for the most part, the species discussed in the briefing. The argument ignores the fact that while there is no limit to the length of a biological opinion, the Plaintiff is subject to limitations on the length of its briefs; it is not practical to expect the Plaintiff to discuss more than 400 species individually. The Plaintiff may use examples of specific species to illustrate its claims without forfeiting its claims as to all other species. More importantly, the Defendant's argument shows a misconception about the nature of the Plaintiff's ESA claims; Plaintiff's arguments are not species-specific; that is, they are not rooted in the outcome of the analysis for particular species, but in the manner in which the ESA agencies performed their statutory and regulatory duties.

The declarations are adequate because they assert an interest in some species pertaining to each of the ESA counts. For example, the Johnston Declaration asserts an interest in the coastal coho salmon, steelhead, and Chinook salmon, all of which are the subject of a jeopardy/adverse modification finding by NOAA Fisheries. Doc. No. 35 at ¶ 7. These are species for which no incidental take statement has been issued, which is the basis for Plaintiff's ESA claim against NOAA Fisheries in Count II. The Halsey Declaration, Doc. No. 27 at ¶ 3, likewise lists several plant species for which the Fish and Wildlife Service made a "jeopardy" determination but did not issue an incidental take statement, which is

the basis for the ESA claim against the Fish and Wildlife Service in Count III.

The Stefferud Declaration asserts an interest in fish species for which the Fish and

Wildlife Service made a "jeopardy" determination. Doc. No. 32 at ¶ 2. The Fish

and Wildlife Service has concluded that its reasonable and prudent alternatives

will alleviate the likelihood of jeopardy to the plants and fish in which these

individual members have asserted an interest, and Count IV of the Second

Amended Complaint challenges that conclusion as arbitrary and capricious. Count

V alleges that the Fish and Wildlife Service failed to consider the value of critical

habitat for recovery for dozens of species that were excluded from detailed

analysis by the coarse filter. Among those species is the bull trout, which is one of

the species listed in the Johnston Declaration. Doc. No. 35 at ¶ 7. Count VI

alleges general defects in the Fish and Wildlife Service's analysis applicable to all

species, including those in which the individual members have stated an interest.

The Plaintiff has established standing through its individual members. The

Defendants' standing challenge is rejected and the merits of the ESA claims will

be considered.

Before doing so, it is necessary to briefly address the Supreme Court's

recent opinion in <u>Summers</u>. <u>Summers</u> was decided after the briefing was complete

in this case, and addressed the question of environmental plaintiffs' standing to

challenge the Forest Service's categorical exclusion regulations.  The government

sought review of an appellate ruling upholding the district court's adjudication of

the merits of the plaintiffs' challenge despite the fact that the parties had already

settled the dispute over the specific project at issue.  The government argued that

because of the settlement, there was no particular project at issue affecting the

plaintiffs and thus they had no standing to challenge the regulations.  The Supreme

Court agreed, explaining that the lone declaration in support of standing was

insufficient "because it was not tied to application of the challenged regulations,

because it does not identify any particular site, and because it relates to past injury

rather than imminent future injury that is sought to be enjoined."  Summers, 129

S.Ct. at 1150.

Summers has little or no application to this case because the ruling in

Summers hinged on the absence of a project that could result in injury to the

plaintiffs.  In this case there is a proposed action and the individual members have

alleged an injury flowing from that action.  Despite this clear distinction, both

parties in this case made filings in response to the Summers opinion.  The

Defendants filed a Notice of Supplemental Authority on March 20, 2009, advising

the Court of the opinion and offering a paragraph of legal argument.  Doc. No. 44.

Plaintiff responded by filing the Second Declaration fo James Johnston (Doc. No.

45), purportedly to provide more specific information about the declarant's

interests. The Second Johnston Declaration adds little to the first with regard to

the declarant's standing, but includes many paragraphs of extra-record information

on the effects of fire suppression, complete with citations to published research.

Defendants filed a motion to strike the Second Johnston Declaration, arguing that

it contains legal argument and expert testimony. Plaintiff filed a response stating

that the Second Johnston Declaration relates only to the issue of standing, and

accusing the Defendants of attempting to argue the standing implications of

Summers in their motion to strike.

As a general rule, courts review agency action based only on the

information before the agency at the time of the decision. Southwest Center For

Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1450 (9th Cir.

1996). Under the four recognized exceptions to the rule, extra-record documents

are permitted (1) if necessary to determine whether the agency has considered all

relevant factors and has explained its decision; (2) when the agency has relied on

documents not on the record; (3) when supplementing the record is necessary to

explain technical terms or complex subject matter; and (4) upon showing of

agency bad faith. Id. Plaintiff makes no effort to show that any one of these

exceptions applies to the Second Johnston Declaration, insisting that it is offered

only to establish standing. Because the Second Johnston Declaration does not add any meaningful information on the standing issue, and because it contains extra-record information that does not fall within one of the exceptions listed above, the Defendants' motion to strike the Second Johnston Declaration (Doc. No. 46) is GRANTED.

### 3.    The Plaintiff's ESA Claims

#### a.    The Coarse Filter (Counts V and VI)

Plaintiff argues that the Fish and Wildlife Service did not comply with the ESA when it relied upon its coarse filter analysis to reach a "no jeopardy" conclusion for 181 species. Plaintiff maintains the coarse filter's expedited analysis did not include the requisite discussion of critical habitat's value for recovery, the direct and indirect effects of the action, and the environmental baseline for each species.

#### i.    Critical Habitat (Count V)

The Fish and Wildlife Service concluded that 181 species are "not likely to be jeopardized" through the use of the coarse filter analysis. USFS AR 339 at 11. The conclusions of the coarse filter analysis are set forth in spreadsheets rather than in narrative form. See Doc. No. 30-4. The coarse filter involved four prongs of analysis: species range and distribution, likelihood of exposure to retardant,

likelihood of take from exposure, and likelihood that any take would result in jeopardy. Id. at 21-22. None of the four prongs deals with the value of critical habitat for recovery. At least 40 of the species analyzed under the coarse filter have designated critical habitat.[24]

Following the Ninth Circuit's decision in Gifford Pinchot, adverse modification to critical habitat occurs when an action causes "appreciable diminishment" of the value of critical habitat for survival *or* recovery. 378 F.3d at 1069-70 (invalidating regulation that effectively confined adverse modification analysis to affects on survival only). "Requiring some attention to recovery issues ... provides some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." National Wildlife Federation v. National Marine Fisheries Service, 524 F.3d 917, 936 (9th Cir. 2008) ("National Wildlife").

Plaintiff complains that for many of the species excluded from detailed analysis by the coarse filter, the Fish and Wildlife Service has conducted no analysis of the value critical habitat for recovery. The Defendants retort by providing a handful of citations to the Biological Opinion where the analysis for

---

[24]The coarse filter spreadsheets that are provided for fish species and mammal species do not appear to indicate whether a species has designated critical habitat.

certain species uses the words "survival," "recovery," and "conservation." None

of those citations involve discussion of the 40 or more species for which the Fish

and Wildlife Service limited its analysis to a series of fields in a spreadsheet. The

Defendants point to the Biological Opinion's discussion of the effects of the action

at the taxonomic group level, USFS AR 339 at 31-39, but they fail to explain how

a discussion of the effects on an entire taxonomic group can support a finding as

to the effects on the value for recovery of specific designated critical habitat for a

specific species.

Defendants eventually concede, "It is true that, for several of the species

identified by the Plaintiff (although not all), the [agency's] analysis is brief and set

out largely in the coarse filter." Doc. No. 30-1 at 12. Even this description of the

coarse filter analysis is generous. There are some species for which critical habitat

is not even mentioned in the coarse filter spreadsheets. The discussion is not

merely brief but nonexistent. Still, Defendants reason the Court should consider

the coarse filter discussion adequate because the agency did the best it could

considering the number of species involved: "In a consultation that involved 387

species and an action area of more than 192 million acres, the coarse filter was not

only rational, but necessary." Doc. No. 30-1 at 11. Defendants cannot excuse the

failure to comply with the law Congress by arguing that compliance would be too

hard.

In their last effort to justify the failure to consider the value of critical

habitat for recovery of the coarse filter species, Defendants cite language in which

the National Wildlife court addresses the sometimes close relationship between

survival and recovery: "We recognize that these concepts [survival and recovery]

are generally considered together in analyzing effects, and it is difficult to draw

clear-cut distinctions." 524 F.3d at 932 n.11 (citation, internal quotations

omitted). Defendants omit the next sentence, which is fatal to their position. The

National Wildlife court went on to add, "However, the agency may not resolve this

difficulty by ignoring recovery needs and focusing entirely on survival, as it has

claimed the right to do here." Id.

This is not a situation in which survival and recovery were adequately

addressed in an intertwined discussion. Rather, the Fish and Wildlife Service

sought to simplify its consultation responsibility by providing a superficial

analysis for 181 threatened or endangered species. Defendants correctly point out

that the law does not impose "an artificial obligation to include a section expressly

discussing recovery for every species." Doc. No. 40 at 18. But that does not mean

the agency can ignore critical habitat entirely, as it does for many species in its

coarse filter analysis. The Plaintiffs are entitled to summary judgment on Count

V.  The proper remedy is remand of the Fish and Wildlife Service Biological

Opinion so that the agency can conduct an assessment for each affected species of

the likelihood of destruction or adverse modification of critical habitat that

complies with the law.

### ii.    Scope of the Analysis

Plaintiff alleges that the Fish and Wildlife Service failed to comply with the

ESA because the agency's reliance on the coarse filter in the Biological Opinion

fails to evaluate the broader effects of fire suppression.  Plaintiff complains that

the coarse filter fails to consider the past and present impacts of fire suppression in

setting the environmental baseline for each species, and that the coarse filter fails

to analyze the direct and indirect effects of the action.  As Plaintiff puts it, "There

is indisputably one federal action that is ubiquitous whenever fire retardant is used

and that often has profound and significant past and present impacts: fire

suppression."  In this argument Plaintiffs want a foot but get an inch.

In preparing a biological opinion on a proposed action, the Fish & Wildlife

Service is required to "evaluate the effects of the action."  50 C.F.R. § 402.14.

The term "effects of the action" is defined in the ESA's implementing regulations

as:

> the direct and indirect effects of an action on the species or critical

> habitat, together with the effects of other activities that are
> interrelated or interdependent with that action, that will be added to
> the environmental baseline. The environmental baseline includes the
> past and present impacts of all Federal, State, or private actions and
> other human activities in the action area, the anticipated impacts of all
> proposed Federal projects in the action area that have already
> undergone formal or early section 7 consultation, and the impact of
> State or private actions which are contemporaneous with the
> consultation in process.

50 C.F.R. § 402.02.  The Service's Section 7 Consultation Handbook adds:

> The environmental baseline is a "snapshot" of a species' health at a
> specified point in time.... The baseline includes State, tribal, local,
> and private actions already affecting the species or that will occur
> contemporaneously with the consultation in progress. Unrelated
> Federal actions affecting the same species or critical habitat that have
> completed formal or informal consultation are also part of the
> environmental baseline, as are Federal and other actions within the
> action area that may benefit listed species or critical habitat.

Final ESA Section 7 Consultation Handbook, March 1998 at 4-22.

Plaintiff's argument confuses the concept of environmental baseline with
the effects analysis, alternately calling for fire suppression activities to be
evaluated as part of the environmental baseline and as part of the direct and
indirect effects of the action.  The two analyses are distinct.  The environmental
baseline is a description of the status quo, i.e., the current condition of the species
*before* the proposed action, along with its direct and indirect effects, takes place.
Thus it is incongruous for Plaintiff to assert that "fire suppression is a part of the

environmental baseline associated with fire retardant use" Doc. No. 25-1 at 10.
The environmental baseline is associated with the species, not the project; the
particular characteristics of the project are irrelevant to the establishment of an
environmental baseline.

This confusion makes it difficult to discern the precise argument offered by
the Plaintiff. The most plausible reading, and the one consistent with Plaintiff's
similar arguments about the scope of the NEPA analysis, is that Plaintiff wants the
agency's analysis of direct and indirect effects of the action to include an analysis
of all fire suppression activities. Any such attempt to expand the scope of the
proposed action fails for the same reason Plaintiff's argument for a broader NEPA
analysis fails: this Court did not order, and the Forest Service did not perform, an
analysis of fire suppression generally. The scope of consultation should match the
scope of the proposed action, and that scope is limited to the use of aerially-
applied fire retardant. The Defendants are entitled to summary judgment on Count
VI.

### b.     The Reasonable and Prudent Alternatives (Count IV)

The Fish and Wildlife Service concluded that the use of fire retardant as
proposed by the Forest Service is likely to result in jeopardy or
destruction/adverse modification for 45 species, including plants, insects,

freshwater mussels, fish and amphibians. The conclusion is based on the
likelihood of the following adverse effects: increases in invasive species, loss of a
substantial fraction of population or habitat, and harm to soil chemistry and plant
physiology (plants); toxicity, sub-lethal physiological harm and loss of
macroinvertebrate prey (freshwater mussels), increases in invasive species,
physiological effects, and death (insects); sub-lethal physiological effects and
direct mortality to individuals and populations (fish); and direct mortality
(amphibians). The Fish and Wildlife Service issued a reasonable and prudent
alternative that it concludes will avoid jeopardy or destruction/adverse
modification for these species. USFS AR 339 at 118-120.

The reasonable and prudent alternative requires the Forest Service to
develop species-specific measures to be implemented during fire response
emergencies. USFS AR 339 at 119. The measures must include preparation of
current maps of the distribution of listed species to be given to incident
commanders, as well as conservation protocols, such as enhancement of
populations, to reduce jeopardy after an emergency. Id. The reasonable and
prudent alternative requires that "[w]herever practical," the Forest Service should
prioritize fuels reduction projects near listed species or critical habitat, to reduce
the likelihood of wildfire affecting the area. Id. Another requirement holds that,

"[w]henever practical, [the Forest Service] will use water or other less toxic fire

retardants than those described in the proposed action within areas designated

critical habitat or occupied by species" that are likely to be jeopardized. Id. The

species-specific measures must also provide for emergency consultation any time

fire retardant is dropped on critical habitat or areas occupied by species that are

likely to be jeopardized. Id. Emergency consultation "may" include monitoring,

compensation for population declines, and removal of non-native plant species and

weeds. Id. Despite the imposition of this reasonable and prudent alternative, the

Fish and Wildlife Service makes clear that its Biological Opinion "in no way

limits the actions that an incident commander deems necessary to undertake during

a fire emergency response." USFS AR 339 at 120.

Plaintiff holds that the Fish and Wildlife Service's Biological Opinion is

arbitrary and capricious because it relies upon a reasonable and prudent alternative

that imposes no true restrictions on the use of aerially-applied fire retardant, and

thus does not avoid jeopardy and destruction/adverse modification of critical

habitat. The challenge to the reasonable and prudent alternative is rooted in the

absence of any binding limitation on the discretion of incident commanders to use

fire retardant. Both the 2000 Guidelines and the reasonable and prudent

alternative contain subjective language qualifying the restrictions on retardant use

-66-

in a way that leaves the ultimate discretion with the incident commander. The

Defendants admit as much in their Response brief when they write,

> In fact, the [Fish and Wildlife Service] considered including
> restrictions on the use of fire retardants in the [reasonable and prudent
> alternative], but decided against it. "since we are not fire fighting
> experts," the [Fish and Wildlife Service] reasoned, "we should not be
> interfering with fire fighting decision makers in their ability to
> respond to a given emergency by using the tools they deem
> appropriate." The [Fish and Wildlife Service] was understandably
> concerned that blanket restrictions on the [use of fire retardant],
> especially applied at this programmatic level and without the benefit
> of a site-specific analysis, could result in the loss of homes or even
> human lives.

Doc. No. 30-1 at 15 (citations omitted).

This concession is fatal to the Fish and Wildlife Service Biological Opinion,

because it reveals that the agency ignored the requirement that listed species "be

afforded the highest of priorities." Tennessee Valley Authority v. Hill, 437 U.S.

153, 174 (1978).[25] The Fish and Wildlife Service has elevated fire suppression

over the protection of jeopardized listed species. The approach taken by the Fish

and Wildlife Service is exemplified by the following language taken from an

---

[25]The parties both devote much argument to their dispute over whether the reasonable and prudent alternative constitutes a mitigation measure that is reasonably likely to occur. The reasonable and prudent alternative, as written, is not difficult to implement, and there is no reason to believe implementation will not occur. The problem, and the crux of the Plaintiff's argument, is that the reasonable and prudent alternative is inadequate to protect listed species, so even when it is fully implemented it will not effectively prevent jeopardy and/or destruction/adverse modification of critical habitat.

agency official explaining in an email message why the agency would not impose

restrictions on the use of fire retardant near endangered populations as a

reasonable and prudent alternative:

> We have concerns regarding the potential consequences if we did
> restrict the use of fire retardant in any area. In a worse case scenario,
> if someone lost their home, or –God forbid–their life, the Service
> (and, by extension, the ESA) could be blamed (rightly or wrongly) for
> not "allowing" the use of fire retardant. Of course, if the FS chooses
> to restrict their own use of retardant that is their prerogative, but we
> should not be requiring that restriction.

FWS AR WO at 666.[26] See also FWS AR WO at 649, in which an employee of

the agency's Region 5 wrote, "[A]t this time, there does not appear to be an RPA

other than *not* using fire retardant on certain parts of the Forests, which we were

advised by [the Washington Office] was not an option." This determination is not

scientific, it is political decision making by the Fish and Wildlife Service.

       After explaining that the agency chose not include concrete restrictions on

the use of fire retardant because it did not want to interfere with firefighting,

Defendants switch gears and attempt to save the reasonable and prudent

alternative by claiming that it will impose meaningful constraints. They do not

agree with the Plaintiff's characterization of the reasonable and prudent alternative

---

[26]Citations to the Fish and Wildlife Service Administrative Record for the agency's
Washington Office are in the following format: FWS WO at [page number].

as toothless, and assert, without citing any support in the record, that "[t]he terms

of the [Biological Opinion] ... do not leave these decisions to the discretion of the

[Forest Service] and instead invoke objective standards." Doc. No. 40 at 17. The

Defendants point to the Biological Opinion's requirement that emergency

consultation be performed each time retardant is used in an area where it could

affect a listed species or critical habitat, suggesting that these site-specific

consultations will ensure that fire retardant is not used in a way that will result in

jeopardy or destruction/adverse modification. The argument, in essence, is that

the Court should disregard the Fish and Wildlife Service's own admissions about

the advisory nature of the reasonable and prudent alternative because the agency

can be trusted to impose the restrictions necessary to protect listed species during

emergency consultation. Congress did not intend the process to be subject to

labile and shifting political winds.

Given the deferential tenor of the Fish and Wildlife Service's Section 7

consultation on fire retardant to this point, any suggestion that the agency will

impose meaningful restrictions during emergency consultation is questionable.[27]

---

[27]Another problem with the agencies' reliance on emergency consultation, discussed in
greater detail in the next section, is that by deferring until the emergency consultation stage the
important function of protecting listed species from jeopardy, the agencies may run afoul of this
Court's holding in the 2003 case forbidding the agencies from relying on solely on the emergency
consultation regulation. 397 F. Supp. 2d at 1257.

As the Fish and Wildlife Service has candidly admitted, the agency was unwilling to impose the restrictions necessary to protect listed species in its Biological Opinion because it placed a higher priority on fire suppression than on the avoidance of jeopardy or destruction/adverse modification. There is no factual reason to assume that the agency will show any more concern for listed species during emergency consultation, when the exigency of the situation elevates political considerations while leaving little time for deliberation.

The Fish and Wildlife Service acted in an arbitrary and capricious manner when it concluded that the reasonable and prudent alternative would prevent jeopardy and/or destruction/adverse modification. The Plaintiff is entitled to summary judgment on Count IV, and the Biological Opinion is remanded to the agency for further proceedings consistent with the law.

### c.    Failure to Include Incidental Take Statements (Counts II and III)

Both of the ESA agencies found jeopardy and/or adverse modification and issued reasonable and prudent alternatives, but neither agency included an incidental take statement in its biological opinion. NOAA Fisheries blamed its failure to include such a statement on the uncertainty over where and to what extent retardant will be used, and stated that it would authorize take on a case-by-

case basis through the emergency consultation process. USFS AR 1075 at 143-144. The Fish and Wildlife Service stated a similar intention to rely on the emergency consultation regulation to authorize take for each fire response action. USFS AR 339 at 120. Despite the absence of an incidental take statement, the Fish and Wildlife Service Biological Opinion contains a re-initiation statement requiring re-initiation of formal consultation if "the amount or extent of incidental take is exceeded." Id. Plaintiff maintains that the ESA agencies violated the law when they failed include incidental take statements in their biological opinions.

Section 7 of the ESA states that a biological opinion "shall" include a written incidental take statement any time an ESA agency offers reasonable and prudent alternatives to avoid jeopardy and concludes that the taking of listed species incidental to the action will not violate Section 7(a)(2). 16 U.S.C. § 1536(b)(4). Both biological opinions offer reasonable and prudent alternatives, but Defendants contend because the opinions do not authorize any incidental take, it is impossible for the ESA agencies to have concluded that incidental take will not violate Section 7, and therefore an incidental take statement is not required.

Defendants argue the ESA agencies are not required to issue incidental take statements because they issued programmatic biological opinions for which such statements are not required under Gifford Pinchot. In that case, the Ninth Circuit

-71-

upheld a biological opinion for a forest plan that declined to address the impacts of any specific action and deferred consideration of incidental takes to future biological opinions addressing specific projects. 378 F.3d at 1064, 1067-1068. The court noted that it has "previously approved programmatic environmental analysis supplemented by later project-specific environmental analysis." Id. at 1068. It also expressed reluctance to fault the Fish and Wildlife Service for relying on the analysis in the forest plan because the court had already approved the forest plan. Id.

Gifford Pinchot does not stand for the proposition that programmatic biological opinions are excused from the incidental take requirement. It merely holds that where an ESA agency relies on the analysis of a pre-approved forest plan, a programmatic biological opinion need not address incidental take, provided the analysis is supplemented by site-specific biological opinions in the future. That holding does little to help the Defendants here, because (1) the ESA agencies did not rely on a pre-approved analysis and (2) the site-specific analyses that the ESA agencies plan to rely on for their incidental take statements will not involve the preparation of biological opinions as contemplated in Gifford Pinchot, but rather an expedited emergency consultation pursuant to 50 C.F.R. § 402.05.

Defendants also rely on the district court's opinion in Western Watersheds

-72-

Project v. Bureau of Land Management, 552 F. Supp. 2d 1113 (D. Nev. 2008).  In

that case, the Bureau of Land Management amended two land resource

management plans covering an area of 7.5 million acres "to provide direction and

continuity in establishing operational procedures to guide all fire management

activities." Id. at 1120.   The amendments had four components: general fire

management, fire prevention, fire suppression, and fire rehabilitation. Id. The

Fish and Wildlife Service prepared a biological opinion finding that the proposed

action would likely have adverse effects on listed species but would not likely

result in jeopardy. Id. at 1138.  The biological opinion did not contain an

incidental take statement, saying, "incidental take and reasonable and prudent

measures may be identified adequately through subsequent actions subject to

section 7 consultations at the project and/or programmatic scale." Id. at 1138-

1139.  Relying on Gifford Pinchot, the Nevada district court held it was

permissible for the agency to issue an incidental take statement "at the time a

specific project is authorized." Id. at 1139.

     As is the case with Gifford Pinchot, Defendants' reliance on Western

Watersheds does not support their claim because the district court's approval of

the programmatic biological opinion is contingent upon the agency's promise to

prepare project-specific biological opinions.  Plaintiff assigns elevated importance

to Western Watersheds because it involves a fire management plan, one

component of which is fire suppression.  But the important issue here is not

whether the action involves fire; rather it is whether the action will be evaluated in

a subsequent biological opinion.  In Western Watersheds, the answer is yes; the

opinion contains no mention of emergency consultation or 50 C.F.R. § 402.05.  In

this case, the answer is no; the ESA agencies make clear in their biological

opinions that they expect all guidance on incidental take to be developed during

emergency consultation.

The fundamental problem with the ESA agencies' failure to issue incidental

take statements is that they justify their failure by promising to evaluate all actual

uses of fire retardant during emergency consultation.  This Court's opinion in the

2003 case explained that reliance on emergency consultation was not sufficient to

satisfy the ESA:

> There is nothing in the case law or statutes to suggest that the ESA
> permits certain agency actions to be exclusively evaluated under the
> lesser strictures of the emergency consultation procedures of 50
> C.F.R. § 402.05. The requirement in emergency situations that formal
> consultation be initiated as soon as practicable after the emergency is
> under control demonstrates that under the ESA framework,
> emergency consultation is intended to be the exception, not the rule.
> The emergency exception is meant for unexpected exigencies. The
> use of fire retardant by the [Forest Service] is not unexpected but
> guaranteed; the only question is when and where it will be used.
> There is no reason why the [Forest Service] cannot conduct formal

consultation with [Fish and Wildlife Service] and no reason to find
that the ESA requires anything less.

397 F. Supp. 2d at 1257.

The Plaintiff argues that the ESA agencies have essentially allowed fire
suppression personnel the unlimited freedom to take listed species because they
have failed to provide a trigger for re-initiation of consultation or an exemption
from the consequences of unauthorized take under ESA Section 9. By the time
post-hoc consultation is complete, Plaintiff argues, it may be too late for a species
that has already been jeopardized by retardant use approved during the emergency.
The Defendants counter by insisting that *no* incidental take is authorized in the
biological opinions, and thus there is a trigger for re-initiated consultation: the
Forest Service must consult any time it uses retardant. The problem with the ESA
agencies' approach is that it means that the first and only meaningful analysis
under Section 7(a)(2) will occur during emergency consultation. This tactic leaves
the impression of circumventing the Court's ruling in the 2003 case by preparing
biological opinions that purportedly constitute Section 7 consultation, while
deferring significant aspects of the required Section 7 analysis until emergency
consultation. This is arguably the same exclusive reliance on emergency
consultation that the Court has already rejected.

The one palatable argument[28] in defense of the biological opinions is that

the unpredictable location and severity of wildfire makes it impossible for the

agencies to specify the impact of incidental taking on the species, as the statute

requires.  There is some merit in the argument that an incidental take statement for

each species would amount to little more than a guessing game.  The counter-

argument is that incidental take statements are needed here not because of their

predictive value, but because they would serve as a last line of defense for the

species, specifying an amount of take that may not be exceeded under Section 9.

In this respect, the Plaintiff's argument about incidental take statements is

subsumed in its broader objection to the ESA process in this case, which is that the

process has not produced any concrete restrictions on the ability of fire

suppression personnel to take listed species.  Plaintiff is suspicious of the

emergency consultation process and does not trust the Forest Service and the ESA

agencies, when engaged in expedited consultation in the heat of the moment, to

constrain fire suppression activities for the protection of the listed species.

---

[28]Defendants distort the holding of Arizona Cattle Growers Association v. United States Fish and Wildlife Service, 273 F.3d 1229 (9th Cir. 2001), to support an argument that it is unlawful for the ESA agencies to provide incidental take statements in this case.  In that case the court found that the agency action was arbitrary and capricious because it issued an incidental take statement without showing that the listed species in question was present in the affected area: "Where the agency purports to impose conditions on the lawful use of that land without showing that the species exists on it, it acts beyond its authority[.]"  Id. at 1244.  The holding has no application here.

Subjective distrust, however, cannot dictate the resolution of the legal issue.

The outcome on this issue depends on the effectiveness of emergency consultation. This is a close question largely because, as is discussed *infra*, the reasonable and prudent alternatives do not impose any concrete restrictions on incident commanders responding to wildfires. If the ESA agencies had imposed meaningful constraints intended to avoid jeopardy or adverse modification, reliance on emergency consultation would not seem so perilous, because the agencies would not be left entirely to their own devices during consultation. This issue ultimately relates back to the adequacy of the reasonable and prudent alternatives. The issue is resolved as to the Fish and Wildlife Service because the reasonable and prudent alternative imposed by the Fish and Wildlife Service is inadequate.

The matter is more problematic where NOAA Fisheries is concerned because the Plaintiff does not challenge any other aspect of the NOAA Fisheries Biological Opinion. In light of the foregoing analysis and the ruling in the 2003 case disfavoring exclusive reliance on emergency consultation, the failure to include an incidental take statement is a violation of the ESA. The cases cited by the Defendants allowed programmatic biological opinions to omit incidental take statements only where the court was satisfied that a second, site-specific biological

-77-

opinion would be prepared.  Here, all that stands between the listed species and take from exposure to fire retardant is an undefined emergency consultation process.  The systematic deferral until emergency consultation of a significant aspect of the agency's consultation role is tantamount to evaluating the action exclusively through emergency consultation, an approach that has already been rejected.

The Plaintiff is entitled to summary judgment on Counts II and III, and the biological opinions are remanded to the respective agencies for further proceedings consistent with the law, including the preparation of an incidental take statement as required by statute.

## IV.  Order

Based on the foregoing, IT IS HEREBY ORDERED that the parties' motions for summary judgment are granted in part and denied in part as follows: summary judgment is GRANTED for Plaintiff (Doc. No. 22) and against Defendants on Counts I, II, III, IV, and V; summary judgment is GRANTED for Defendants (Doc. No. 30) and against Plaintiff on Count VI; and Defendants' motion to strike the Second Johnston Declaration (Doc. No. 46) is GRANTED. The Environmental Assessment and biological opinions are set aside and remanded for further proceedings consistent with the law.

IT IS FURTHER ORDERED that on remand, the Forest Service shall complete consultation with the ESA agencies, complete the NEPA process and issue a final decision no later than December 31, 2011. The Federal Defendants are advised that failure to comply with this deadline may subject them to sanctions, including contempt proceedings, and could conceivably result in enjoining the continued use of aerially-applied fire retardant until the law enacted by Congress is complied with. The issue requires immediate attention.

IT IS FURTHER ORDERED that Plaintiff's request for additional briefing regarding the appropriate remedy is DENIED.

Dated this _27_ day of July, 2010.

16:37 p.m.

Donald W. Molloy, District Judge
United States District Court